**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WILL LIAO, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UP FINTECH HOLDING LIMITED, TIANHUA WU, and JOHN FEI ZENG,<br><br>Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Will Liao ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a

review of the Defendants' public documents, public filings, wire and press releases published by and regarding UP Fintech Holding Limited ("UP Fintech" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. [1]

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded UP Fintech securities between April 22, 2024 and June 2, 2026, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

[1] Unless otherwise stated, all emphasis is added and internal citations are omitted.

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased UP Fintech securities during the Class Period and was economically damaged thereby.

7. Defendant UP Fintech purports to be a "leading integrated financial technology platform providing cross-market, multi-product investment experience for investors around the world."

8. Defendant UP Fintech is incorporated in the Cayman Islands. Its principal executive offices are located at 1 Raffles Place, # 35-61, One Raffles Place Singapore (048616). It maintains a subsidiary in Roseland, New Jersey, called TradeUP Securities Inc. Further indicating UP Fintech's New Jersey presence, the Company reported in its 2025 Annual Report that it had paid $729,000 in taxes to New Jersey in 2023, $2,971,000 in taxes to New Jersey in 2024, and $5,120,000 in taxes to New Jersey in 2025.

9. UP Fintech's American Depositary Shares ("ADS" or "ADSs") trade on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "TIGR."

10. Defendant Tianhua Wu ("Wu") has served as the Company's Chief Executive Officer ("CEO") at all relevant times. He also serves as a director.

11. Defendant John Fei Zeng ("Zeng") served as the Company's Chief Financial Officer ("CFO") at all relevant times.

12. Defendants Wu and Zeng collectively referred to herein as the "Individual Defendants."

13. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

14. UP Fintech is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to UP Fintech under *respondeat superior* and agency principles.

16. Defendant UP Fintech and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Class Period

17. On April 22, 2024, the Company filed with the SEC its annual report on Form 20-F for the year ended December 31, 2023 (the "2023 Annual Report"). Attached to the 2023 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Wu and Zeng attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

18. The 2023 Annual Report contained the following risk disclosure:

> ***We may not be able to obtain or maintain all necessary licenses, permits and approvals and to make all necessary registrations and filings for our activities in multiple jurisdictions and related to residents therein, especially in China or otherwise related to PRC residents.***
>
> We operate in a heavily-regulated industry which requires various licenses, permits and approvals in different jurisdictions to conduct our businesses. Our customers include people who live in jurisdictions where we do not have licenses issued by the local regulatory bodies. It is possible that authorities in those jurisdictions may take the position that we are required to obtain licenses or otherwise comply with laws and regulations which we believe are not required or applicable to our business activities. ***If we fail to comply with the regulatory requirements, we may encounter the risk of being disqualified for our existing businesses or being rejected for renewal of our qualifications upon expiry by the regulatory authorities as well as other penalties, fines or sanctions. In addition, in respect of any new business that we may contemplate, we may not be able to obtain the relevant approvals for developing such new business if we fail to comply with the relevant***

***regulations and regulatory requirements.*** As a result, we may fail to develop new business as planned, or we may fall behind our competitors in such businesses.

In addition, a significant portion of our technology research and development, management, supporting and other teams are based in China and a significant portion of our customers are Chinese speaking people including PRC citizens. Our PRC subsidiaries and the VIEs work closely with and provide significant supporting services for our trading platform outside of China as well as teams in New Zealand, Hong Kong, Singapore, the United States and Australia.

In July 2016, the CSRC posted an investor alert on its website warning investors that except for certain investment channels approved by the CSRC under the PRC laws, the CSRC has not approved any domestic or foreign institutions to provide services for domestic investors to participate in overseas securities trading. In September 2016, we received a rectification notice issued by the Beijing branch of the CSRC. Following such notice, we took certain rectification measures in order to comply with the requirements set forth therein, and we provided written responses to such authority promptly. We communicate with the Beijing branch of the CSRC from time to time to ensure our business follow their requirements.

***On December 30, 2022, the CSRC issued the CSRC 1230 Notice, stating that we had been carried out cross-border securities business for Chinese mainland investors without approval of the CSRC, and such activities constitute illegal operation of securities business under the Securities Law of the PRC. The CSRC 1230 Notice set out two principal rectification requirements***. (i) We should stop all incremental illegal operations in Chinese mainland, such as soliciting and developing any new Chinese mainland customers or opening new securities accounts for them; and (ii) We should properly handle the existing accounts held by Chinese mainland investors by allowing them to continue their transactions through such accounts. However, we are strictly prohibited from accepting any incremental funds that violate PRC foreign exchange regulations to such existing accounts. Furthermore, on February 15, 2023, the CSRC published its official reply in response to the public attention on the CSRC 1230 Notice, emphasizing its core requirements of “prohibiting incremental illegal business effectively and solving existing issues properly” in order to regulate our business operations in Chinese mainland. We have been actively and may continue to be in cooperation with CSRC to satisfy 1230 Notice and meet the rectification requirements set out

under CSRC 1230 Notice. ***Starting from May 18, 2023, our APP "Tiger International" has been removed from the PRC application market. Besides, we cannot rule out the possibility that we may take the initiative to adopt applicable rectification measures in the future to further curb incremental Chinese mainland domestic users and meet the requirements of the CSRC***.

***However, if the CSRC is not satisfied with our rectification measures or the CSRC imposes other further regulatory actions or penalties on us, our business and results of operations may be materially and adversely affected.*** Furthermore, new laws and regulations in connection with our business activities may be adopted from time to time. While we will make best efforts to continue to fulfill the requirements under any applicable future PRC laws and regulations, there may be substantial uncertainties regarding the interpretation and application of current or any future PRC laws and regulations applicable to our business and the PRC government or other governmental authorities may ultimately take a view that is inconsistent with our opinion.

For more details of the notice and our rectification measures, please see "Item 3. Key Information – Description of Certain PRC Regulations Affecting Our Business." However, we cannot assure you that we will not be subject to further investigation or scrutiny from regulators. If we are required to make further rectifications, our business and financial condition could be materially and adversely affected. If we fail to receive required permits in a timely manner or at all, or obtain or renew any permits and certificates, we may be subject to fines, confiscation of the gains derived from our non-compliant activities, suspension of our non-compliant activities or claims for compensation of any economic loss suffered by our customers or other relevant parties.

19. The 2023 Annual Report further contained the following statement:

***PRC Regulations Relating to Securities and Future Brokerage Business***

Under existing PRC securities laws and regulations, including *Securities Law of the PRC*, which was most recently amended on 28 December, 2019 became effective on March 1, 2020, operating securities business in the PRC, including among others, securities brokerage business, futures brokerage business, stock option brokerage business, and securities and futures

investment consulting services, requires a securities brokerage license or certain other approvals from the Chinese Securities Regulatory Commission, or the CSRC. In addition, the Securities Law also stipulates that the offering and trading of securities outside the PRC which disrupt the domestic market order of the PRC and harm the legitimate rights and interests of domestic investors shall be dealt with pursuant to the relevant provisions of this Securities Law, and legal liability shall be pursued. This is the second major set of amendments of the Securities Law since the major revision in 2005. Three main changes have been widely reported and discussed, namely, (i) the reform of the registration-based IPO system, (ii) the imposition of more severe punishments for violations, and (iii) the enhancement of protection for retail investors.

On January 13, 2023, the CSRC promulgated the *Measures for the Administration of the Securities Brokerage Business*, which became effective on February 28, 2023. Under the *Measures for the Administration of the Securities Brokerage Business*, an overseas securities business entity that conducts securities business or establishes a representative office in Chinese mainland shall obtain the approval of the securities regulatory authority of the State Council. The specific measures shall be formulated by the securities regulatory agency of the State Council and submitted to the State Council for approval. An overseas securities business entity violating Article 95 of the Regulations on Supervision and Administration of Securities Firms, directly or through its affiliates conducting activities such as opening account, marketing and other activities of overseas securities trading services for domestic investors without authorization, shall be penalized in accordance with the *Securities Law of the PRC*.

***Failure to comply with such laws and regulations may result in penalties, including rectification requirements, confiscation of illegal proceeds, fines or even shutting down of business.*** In relation to our business in the PRC, one of our PRC entities received a rectification notice issued by the Beijing branch of the CSRC in September 2016, which required us, among others, to refrain from providing support to unauthorized foreign service providers that conduct securities business in China. Following the notice, we took certain rectification measures, including among others, (i) removing links to, and access to account opening functions of the website and the APP previously developed by such PRC entity; (ii) deleting "Zhengquan" (securities in Chinese) and "Gupiao" (stocks in Chinese) from the name of the APP previously developed by such PRC entity; and (iii) timely submitting in

writing to the Beijing branch of the CSRC to brief on the rectification measures made by such PRC entity. Afterwards, we had communicated with the Beijing branch of the CSRC for a few times and further adjusted our business in China to comply with PRC laws. We believed that we had taken necessary measures in response to the above notice.

However, on December 30, 2022, the CSRC issued another notice, or CSRC 1230 Notice, stating that we had carried out cross-border securities business for Chinese mainland investors without approval from the CSRC, and such activities constitute illegal operation of securities business under the Securities Law of the PRC. The CSRC 1230 Notice set out two principal rectification requirements: (i) we should stop all incremental illegal operations in Chinese mainland, such as soliciting and developing any new Chinese mainland customers or opening new securities accounts for them; and (ii) we should properly handle the existing accounts held by Chinese mainland investors by allowing them to continue their transactions through such accounts. However, we are strictly prohibited from accepting any incremental funds that violate PRC foreign exchange regulations to such existing accounts. ***Furthermore, on February 15, 2023, the CSRC published its official reply in response to the public attention on the CSRC 1230 Notice, emphasizing its core requirements of "prohibiting incremental illegal business effectively and solving existing issues properly" in relation to its supervision and regulation of our business operations in Chinese mainland. We have been actively and will use best efforts to continue to be in cooperation with CSRC to satisfy 1230 Notice and meet the rectification requirements set out under CSRC 1230 Notice.*** Starting from May 18, 2023, our APP "Tiger International" has been removed from the PRC application market.

However, we cannot assure you that we will not be subject to further investigation or scrutiny or be imposed any additional requirements in the future. Besides, if the CSRC is not satisfied with our rectification measures or the CSRC imposes other further regulatory actions or penalties on us, our business and results of operations may be materially and adversely affected. See Item 3.D "Risk Factors-Risks Related to Our Business and Industry-We may not be able to obtain or maintain all necessary licenses, permits and approvals and to make all necessary registrations and filings for our activities in multiple jurisdictions and related to residents therein, especially in China or otherwise related to PRC residents."

20. The statements in ¶¶ 18-19 were materially false and misleading at the

time they were made because they understated the Company's regulatory risk as a result of continued illegal activity in China. For the same reason, the statements overstated the Company's efforts to rectify prior misconduct or illegal activity.

21. On April 23, 2025, the Company filed with the SEC its annual report on Form 20-F for the year ended December 31, 2024 (the "2024 Annual Report"). Attached to the 2024 Annual Report were certifications pursuant to SOX signed by Defendants Wu and Zeng attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

22. The 2024 Annual Report contained substantially similar risk disclosures to the ones contained in ¶ 18 and ¶ 19.

23. As such, those statements were materially false and misleading for the reasons stated in ¶ 20.

24. On April 24, 2026, the Company filed with the SEC its annual report on Form 20-F for the year ended December 31, 2025 (the "2025 Annual Report"). Attached to the 2025 Annual Report were certifications pursuant to SOX signed by Defendants Wu and Zeng attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

25. The 2025 Annual Report contained substantially similar risk

disclosures to the ones contained in ¶ 18 and ¶ 19.

26. As such, those statements were materially false and misleading for the reasons stated in ¶ 20.

27. The statement contained in ¶¶ 18-19, 22, 25 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) UP Fintech materially understated its legal and regulatory risk, considering its continued illegal activity in China, and (2) as a result, Defendants' statements about UP Fintech's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**<u>THE TRUTH BEGINS TO EMERGE</u>**

28. On May 22, 2026, before the market opened, *Reuters* published an article entitled "China to crack down on 'illegal' cross-border securities". The article stated in part the following:

> ***China announced a major crackdown on cross-border investment on Friday and said it would punish brokers it accused of illegally moving money to foreign markets, sending their shares plunging.***
>
> ***Online brokers Tiger, Futu and Longbridge would be penalised for soliciting business in China without an onshore licence, the securities regulator said***. Shares in Futu and Tiger parent UP Fintech Holding fell more than 30% in U.S. premarket trade.

29. The article further stated the following:

> The move intensifies scrutiny of capital outflows - which are strictly controlled by China - and also sent shares of popular Chinese companies listed abroad lower because the brokers' clients will be limited to selling shares, not buying.
>
> ***The China Securities Regulatory Commission, which launched the crackdown with seven other government agencies including the central bank, said in a statement it was targeting overseas firms and their local partners operating without approval.***
>
> ***It said illegal gains would be forfeited.***
>
> * * *
>
> ***[Tiger's] parent, UP Fintech , said the CSRC Beijing bureau had imposed administrative penalties of 308.1 million yuan and confiscation of illegal income of 103.1 million yuan over illegal activities by its subsidiaries, a filing showed***.

30. On May 22, 2026, Up Fintech filed with the SEC a Current Report on Form 6-K, attached to which was an announcement (under Exhibit 99.1) entitled "Press Release — UP Fintech Holding Limited Announces Experiencing an Ongoing Investigation Conducted by CSRC Beijing Bureau," which stated the following:

> On May 22, 2026, certain subsidiaries of UP Fintech Holding Limited (NASDAQ: TIGR) (the "**Company**") received notices from the China Securities Regulatory Commission Beijing Bureau (the "**CSRC Beijing Bureau**") indicating that the CSRC Beijing Bureau had initiated an investigation into their ***suspected illegal operations of securities, fund and futures business, and found that these subsidiaries had conducted unlicensed cross-border securities business and illegal activities relating to the fund and futures business in mainland China***. Based on its findings, the

CSRC Beijing Bureau has imposed administrative penalties in the aggregate amount of approximately RMB308.1 million and confiscation of illegal income in the aggregate amount of approximately RMB103.1 million. Mr. Tianhua Wu, a director and the CEO and controlling person of the Company, has also received a warning and penalty of RMB1.25 million. As of the end of 2025, retail client assets in mainland China under the Company's consolidated accounts constituted approximately 10% of the Company's total client assets.

The Company accepts the penalty with sincerity. The Company is fully cooperating with the regulatory authorities, and will strictly implement the rectification measures required by the authorities. The Company remains committed to fulfilling its obligations as an online brokerage firm and complying with applicable laws and regulations.

31. On this news, UP Fintech ADSs fell $1.48 per ADS, or 25.3%, to close at $4.36 on May 22, 2026.

32. On June 2, 2026, before market open, the Company issued a press release entitled "UP Fintech Holding Limited Reports Unaudited First Quarter 2026 Financial Results." The article contained the following statement from Defendant Wu:

> In the first quarter, we continued to expand our user base and client assets, while further optimizing our comprehensive product offerings. Supported by these solid fundamentals, both our topline and operating performance have achieved notable year-over-year growth. Our total revenue for the first quarter reached US$154.9 million, representing a 26.3% increase year over year. ***Net loss and non-GAAP net loss attributable to UP Fintech for the quarter were $26.9 million and $23.8 million, versus net income of $30.4 million and $36.0 million in the same quarter last year*. *Recently on May 22, the Beijing Bureau of the China Securities Regulatory Commission (CSRC) issued administrative penalties and ordered the confiscation of illegal gains against certain subsidiaries of the Company, with a total amount of approximately RMB 411 million (equivalent to roughly $59.7 million).*** The penalties stemmed from certain subsidiaries' unlicensed cross-

> border securities business and illegal activities relating to the fund and futures business in mainland China. The Company sincerely accepts the penalty and has recognized it as a subsequent significant event for the first quarter. Considering the Company's overall profitability and cash flow position, this one-off expense will not have a material adverse impact on our business operations or long-term development.

33. On this news, UP Fintech ADSs fell $0.20 per ADS, or 3.86%, to close at $4.97 on June 2, 2026. The following day, UP Fintech ADSs fell a further $0.30 per ADS, or 6%, to close at $4.67 on June 3, 2026.

34. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities. Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

35. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired UP Fintech securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of UP Fintech, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, UP Fintech securities were actively

traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

37. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

38. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of UP Fintech;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused UP Fintech to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of UP Fintech securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

41. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- UP Fintech shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;
- As a public issuer, UP Fintech filed periodic public reports;
- UP Fintech regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- UP Fintech's securities were liquid and traded with moderate to heavy volume during the Class Period; and
- UP Fintech was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

42. Based on the foregoing, the market for UP Fintech securities promptly digested current information regarding UP Fintech from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and

the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

43. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants**

44. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

46. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

47. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of UP Fintech securities during the Class Period.

48. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of UP Fintech were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of UP Fintech, their control over, and/or receipt and/or modification of UP Fintech's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning UP Fintech, participated in the fraudulent scheme alleged herein.

49. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other UP Fintech personnel to members of the investing public, including Plaintiff and the Class.

50. As a result of the foregoing, the market price of UP Fintech securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of UP Fintech securities during the Class Period in purchasing UP Fintech securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

51. Had Plaintiff and the other members of the Class been aware that the market price of UP Fintech securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased UP Fintech securities at the artificially inflated prices that they did, or at all.

52. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

53. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of UP Fintech securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

54. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

55. During the Class Period, the Individual Defendants participated in the operation and management of UP Fintech, and conducted and participated, directly and indirectly, in the conduct of UP Fintech's business affairs. Because of their senior positions, they knew the adverse non-public information about UP Fintech's business practices.

56. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to UP Fintech's financial condition and results of operations, and to correct promptly any public statements issued by UP Fintech which had become materially false or misleading.

57. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various

reports, press releases and public filings which UP Fintech disseminated in the marketplace during the Class Period concerning UP Fintech's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause UP Fintech to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of UP Fintech within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of UP Fintech securities.

58. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by UP FINTECH.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: October 26, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
/s/ Laurence M. Rosen
Laurence Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*